UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



------------------------------------------------------------------------
PCL (SHIPPING) PTE LTD.,

           Plaintiff,

  - against -

CHINAOIL (JAPAN) CO. LTD.,

           Defendant.
------------------------------------------------------------------------X

07 CV

ECF CASE

## VERIFIED COMPLAINT

Plaintiff, PCL (SHIPPING) PTE LTD., (hereafter referred to as "PCL" or "Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendant, CHINAOIL (JAPAN) CO. LTD. ("Chinaoil" or "Defendant"), alleges, upon information and belief, as follows:

1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the breach of maritime contract of charter. This matter also arises under the Court's federal question jurisdiction within the meaning of 28 United States § 1331 and the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*) and/or the Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

2.    At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of Singaporean law and was at all material times the disponent owner of the motor tanker vessel "ALAM CERGAS" (hereinafter the "Vessel").

3.     Upon information and belief, Defendant Chinaoil was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of the laws of Japan with a place of business at 8F, Hibiya Building, 1-1, Shinbashi 1-Chrome, Minato-Ku, Tokyo, Japan and was at all material times the Charterer of the Vessel.

4.     By a charter party dated June 20, 2007 as evidenced by a fixture recap dated June 21, 2007, Plaintiff voyage chartered the Vessel to Defendant for the carriage of up to a full cargo of unleaded clean petroleum product from one safe port Dalian, China to a discharge range of one safe port Singapore, one safe port South Korea, one safe port Japan (including, but not north of, Tokyo Bay) or one safe port Philippines, Bataan – Batangas Range including Subic Bay. A copy of the charter party and fixture recap is annexed hereto as Exhibit 1.

5.     Plaintiff delivered the Vessel into the service of the Defendant and fully performed all duties and obligations under the charter party and the Vessel successfully completed the voyage discharging her cargo at Chiba, Japan.

6.     A dispute arose between the parties regarding Defendant's failure to pay demurrage[1] due and owing to Plaintiff under the charter party contract.

7.     As a result of Defendant's breach of the charter party due to its failure to pay demurrage, Plaintiff has sustained damages in the total principal amount of $166,146.09, exclusive of interest, arbitration costs and attorneys' fees.

8.     Despite due demand, Defendant has failed to pay the amount due and owing under the charter party. Attached hereto as Exhibit 2 is a copy of the Plaintiff's demurrage invoice dated September 6, 2007.

---

[1] Demurrage is a liquidated damage for delay set forth in the charter party that requires a charterer to pay to owner when the vessel is prevented from the loading or discharging of cargo within the stipulated laytime (i.e., the maximum time permitted in the charter party for cargo operations – here defined by the charter party as $21,000 per day, pro rata.)

2

9. Defendant has previously conceded that the claimed demurrage is due and owing to the Plaintiff. Attached hereto as Exhibit 3 is a copy of the Defendant's messages in which they concede the sum due to Plaintiff dated October 18, 2007 and November 14, 2007.

10. Pursuant to the charter party, disputes between the parties are to be submitted to arbitration in London, with English law to apply. See Clause K and Clause 24 of the charter party.

11. This action is brought in order to obtain jurisdiction over Chinaoil and also to obtain security for Plaintiff's claims and in aid of arbitration proceedings.

12. Interest, costs and attorneys' fees are routinely awarded to the prevailing party in London arbitration. As best as can now be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing party:

| | | |
|---|---|---|
| A. | Principal claim – Unpaid demurrage | $166,146.09 |
| B. | Interest on claim (3 years at 7.5% compounded quarterly) | $41,489.40 |
| C. | Estimated arbitration costs: | $50,000; and |
| D. | Estimated attorneys' fees and expenses: | $75,000.00. |
| **Total** | | **$332,635.49.** |

13. The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant.

3

14.     The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiff's claim as described above.

**WHEREFORE,** Plaintiff prays:

A.     That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

B.     That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of $332,635.49 belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.     That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

4

D.     That this Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending, or which may be

initiated in the future, including any appeals thereof;

E.     That this Court recognize and confirm any arbitration award(s) or judgment(s)

rendered on the claims set forth herein as a Judgment of this Court;

F.     That this Court award Plaintiff the attorneys' fees and costs incurred in this

action; and

G.     That the Plaintiff has such other, further and different relief as the Court

may deem just and proper.

Dated:     Southport, CT
           November 27, 2007

                              The Plaintiff,
                              PCL (SHIPPING) PTE LTD.

                              By: _Charles E. Murphy_

                              Charles E. Murphy
                              Kevin J. Lennon
                              LENNON, MURPHY & LENNON, LLC
                              420 Lexington Avenue, Suite 300
                              New York, NY 10170
                              (212) 490-6050 - phone
                              (212) 490-6070 - facsimile
                              cem@lenmur.com
                              kjl@lenmur.com

5

## ATTORNEY'S VERIFICATION

State of Connecticut )
                     )    ss.:    Town of Southport
County of Fairfield  )

1.    My name is Charles E. Murphy.

2.    I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.    I am a partner in the firm of Lennon, Murphy & Lennon, LLC attorneys for the

Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.    The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.    The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    Southport, CT
          November 27, 2007

Charles E. Murphy

6

# EXHIBIT 1

Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977

RAFFLES SHIPBROKERS (S) PTE LTD
315 Outram Road #09-05
Tan Boon Liat Building
Singapore 169074

1ST ORIGINAL
CODE WORD FOR THIS
CHARTER PARTY:

ASBATANKVOY

*T0173/07*

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

|  |  |
|---|---|
| *SINGAPORE*<br>Place | *20TH JUNE 2007*<br>Date |

**THIS THIS DAY AGREED** between *PCL (SHIPPING) PTE. LTD.*

owner/owner (hereinafter called the "Owner") of the *Singapore Flag, Built 2007*

*M.T. "ALAM CERGAS"*                                                    (hereinafter called the "Vessel")

*CHINA OIL BEIJING OR ITS NOMINEE*                                     (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

## PART I

A. Description and Position of Vessel:       *L.O.A.: 171.20 Metres       BEAM: 27.40 Metres       TPC: 41.5 Tonnes       BCM: 83.30 Metres*
                                            *KTM: 44.70 Metres       Fitted With: IGS/SBT       DERRICKS: 1 x 10mt Crane*

Deadweight: *34,671 metric tons*   Classed: *Lloyds Register*

Loaded draft of Vessel on assigned summer freeboard *11.888 metres ft.*   in salt water.

Capacity for cargo:       *36,736.40 Cubic Metres at 98% excluding slop tanks*
Slop Tank Capacity : *1,315.60 Cubic Metres at 98%* tons (of 2240 lbs. each)

Coated:       [ x ] Yes       *Epoxy*       [ ] No

Coiled:       [ x ] Yes       *Stainless Steel*       [ ] No

Last two *three* cargoes: *New Building/New Building/New Building*

Now: *Vessel ex Yard Dalian 20th June if all goes well weather permitting*       Expected Ready: *25th June 2007*

B. Laydays:

                Commencing: *25th June 2007*       Cancelling: *27th June 2007*

C. Loading Port(s):       *One (1) safe port Dalian.*



D. Discharging Port(s):       *Please refer to Special Provision M1*



E. Cargo:       *Charterers option upto full cargo. Unleaded Clean Petroleum Product undarkar than 2.5 NPA maximum two (2) grades within vessel's natural segregation. Excluding Lubes, MTBE, Chemicals, Petrochemicals, Casinghead and Pentanes.*





F. Freight Rate:       *Please refer to Special Provision M2*

G. Freight Payable to:       *Please refer to Special Provision M3* at



12.   Total Laytime in Running Hours:   *Eighty-Four (84) Hours*

I.    Demurrage per day: *United States Dollars 21,000.00 Per Day Pro-Rata*

J.    Commission of *1.25 %* is payable by Owner to *Raffles Shipbrokers (S) Pte. Ltd.*

      on the actual amount freight/*demurrage*, when and as freight/*demurrage* is/are paid.

K.    The place of General Average and arbitration proceedings to be London/New York (strike out one).

~~L.    To wit: Owner warrants Vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.~~

M.    Special Provisions:

      *Special Provisions M1 to M13 as per attached are deemed to be incorporated to form part of
      PART I of this CHARTER PARTY.*

      IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate
as of the day and year first above written.

Witness the signature of:

PCL (SHIPPING) PTE. LTD.
AS COMMERCIAL OPERATOR

By: ...................................................
      Rena NIELSEN

Witness the Signature of:

                                                    *CHINA OIL BEIJING OR ITS NOMINEE
                                                            AS CHARTERERS*

                                                    By: ...................................................

                                                    ...................................................

This Charterparty is a computer generated copy of ASBATANKVOY form, printed under license from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited. It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted as having been made by the licensee or end user as appropriate and not by the author.

## PART II

1.   WARRANTY - VOYAGE - CARGO. The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceeds ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and tight for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat), from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2.   FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3.   DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4.   NAMING LOADING AND DISCHARGE PORTS.

(a)   The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

On a voyage to a port or ports in:

| | |
|---|---|
| ST. KITTS | Caribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) |
| | (from ports west of Port Said.) |

(b)   If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports in: |
|---|---|
| LANDS END | United Kingdom/Continent (Bordeaux/Hamburg range) |
| | or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTAR | Mediterranean (from Western Hemisphere). |

(c)   Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime.

5.   LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6.   NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a loading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7.   HOURS FOR LOADING AND DISCHARGING. The master of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8.   DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9.   SAFE BERTHING - SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lightening being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to such berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10.   PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Vessel, and out of the Vessel at the expense of the Vessel but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignees. If required by Charterer, Vessel after discharging is in clear alone of pipe lines of cargo by pumping water through; then and then consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11.   HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for loading and discharging submarine lines.

12.   DUES - TAXES - WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at La Plata and Portuguese Imposto de Comercio Maritimo. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental dues which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13.   (a)   CARGOES EXCLUDED: VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100 deg F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b)   FLASH POINT. Cargo having a flash point and/or not loaded and fifteen degrees Fahrenheit (115 deg F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from landing or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14.   (a)   ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgement, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port which is free from ice and where there are facilities for the loading or unloading of the cargo in bulk. The whole of the time occupied from the time the Vessel is directed by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b)   If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him a reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or unloading of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15.   TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate specified in Part I hereof provides for special privileges or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a)   Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b)   All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(e)  Time continued shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

(f)  Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16.  GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or unshippable bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause 1.

17.  (a)  QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b)  FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18.  CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the Owner in the loading, care or discharge of the cargo.

19.  GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:- any act, neglect, default or barratry of Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault or privity of the Owner. And neither the Vessel nor Master or owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from:- act of God; act of war; perils of the sea; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20.  ISSUANCE AND TERMS OF BILLS OF LADING.

(a)  The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

(b)  The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i)  CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

(ii)  JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii)  GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by these rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreement and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any such deposit being made as security in any General Average shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account at a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv)  BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

(v)  LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi)  WAR RISKS.  (a)  If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b)  If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge - the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other such port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(c)  The Vessel shall have liberty to comply with any directions or recommendations as to loading, departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government or the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority including any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person or body acting under any of the foregoing or with the authority of any of them having under the terms of the war risks insurance on the Vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

(vii)  DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured persons on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21.  LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any sub-cargo.

22.  AGENTS. The Owner shall appoint Vessel's agents at all ports.

23.  BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of such and attorney fees incurred in any action hereunder.

24.   ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with probably the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city above-mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25.   SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfilment of this Charter in all its terms and conditions.

26.   OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel in loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

## BILL OF LADING

Shipped in apparent good order and condition by

on board the

whereof

Steamship/Motorship

's Master, at the port of

to be delivered at the port of

or so near thereto as the Vessel can safely get, always afloat, unto

or unto on payment of freight at the rate of

This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London

between                                                                and                                                                , as Charterer, and
all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed                                                                                                                        Bills of Lading

of this tenor and date, one of which being accomplished, the others will be void.

Dated at                                                                                                    this                           day of

                                                                                                                                                                        Master

This Charter Party is a computer generated copy of the ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by striking out of original characters, or the insertion of new character, such characters clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the insertor or end user as appropriate and not by the author.

*RAFFLES SHIPBROKERS (S) PTE. LTD.*

M.T. "ALAM CERGAS"/CHINA OIL BEIJING OR ITS NOMINEE
CHARTER PARTY DATED 20TH JUNE 2007
============================================================

N.   SPECIAL PROVISIONS:
     -------------------

1.   Discharging Port(s):
     --------------------
     One (1) safe port Singapore or in Charterer's option
     One (1) safe port South Korea, Inchon - Ulsan Range

     One (1) safe port Japan not North of but including Tokyo Bay or
     in Charterer's option

     One (1) safe port Philippines, Bataan - Batangas Range including
     Subic Bay

     If vessel to discharge South Korea or Japan, Charterers to
     declare latest by 1200 Hours Singapore Time on 22nd June 2007,
     Friday.

2.   Freight Rate(s):
     ---------------
     Lumpsum US$ 350,000.00 basis 1/1 Singapore
     Lumpsum US$ 300,000.00 basis 1/1 South Korea
     Lumpsum US$ 330,000.00 basis 1/1 Japan
     Lumpsum US$ 340,000.00 basis 1/1 Philippines

3.   Freight Payable To:
     ------------------
     In United States Dollars via telegraphic transfer to the Owners
     nominated account:

     THE BANK OF NEW YORK, NEW YORK
     FOR ACCOUNT OF OCBC BANK, SINGAPORE
     SWIFT      : OCBCSGSG
     FAVOURING  : NEW JOHNSON HOLDINGS LIMITED
     USD A/C NO. : 501-885172-201
     UNDER TEXTED TELEX ADVICE TO OCBC BANK, SINGAPORE UPON REMITTANCE

4.   Worldscale Terms and Conditions.

5.   Any taxes and/or dues on freight and/or cargo to be for Charterer's
     account and settled directly by them.

1

*RAFFLES SHIPBROKERS (S) PTE. LTD.*

M.T. "ALAM CERGAS"/CHINA OIL BEIJING OR ITS NOMINEE
CHARTER PARTY DATED 20TH JUNE 2007
=================================================

6.    BIMCO ISPS Clause:
      ------------------
      (A)    (i)    From the date of coming into force of the International
                    Code for the security of Ships and of Port Facilities and
                    the relevant amendments to Chapter XI of SOLAS (ISPS
                    Code) in relation to the vessel, the Owners shall
                    procure that both the vessel and 'The Company' (as
                    defined by the ISPS Code) shall comply with the
                    requirements of the ISPS Code relating to the vessel and
                    'The Company'.  Upon request the Owners shall provide a
                    copy of the relevant International Ship Security
                    Certificate (or the Interim International Ship Security
                    Certificate) to the Charterers.  The Owners shall
                    provide the Charterers with the full style contact
                    details of The Company Security Officer (CSO).

             (ii)   Except as otherwise provided in this Charter Party,
                    loss, damage, expense or delay, excluding consequential
                    loss, caused by failure on the part of the Owners or
                    'The Company' to comply with the requirements of the
                    ISPS Code or this Clause shall be for the Owner's
                    account.

      (B)    (i)    The Charterers shall provide the CSO and the Ship
                    Security Officer(SSO)/Master with full style contact
                    details and any other information the Owners require
                    to comply with the ISPS Code.

             (ii)   Except as otherwise provided in this Charter Party,
                    loss, damage, expense, excluding consequential loss,
                    caused by failure on the part of the Charterers to
                    comply with this Clause shall be for the Charterer's
                    account and any delay caused by such failure shall be
                    compensated at the demurrage rate.

      (C)    Provided that the delay is not caused by the Owner's failure
             to comply with their obligations under the ISPS Code, the
             following shall apply:

             (i)    Notwithstanding anything to the contrary provided in
                    this Charter Party, the vessel shall be entitled to
                    tender Notice of Readiness even if not cleared due to
                    applicable security regulations or measures imposed by a
                    port facility or any relevant authority under the ISPS
                    Code.

2

*RAFFLES SHIPBROKERS (S) PTE. LTD.*

M.T. "ALAM CERGAS"/CHINA OIL BEIJING OR ITS NOMINEE
CHARTER PARTY DATED 20TH JUNE 2007


M.T. "ALAM CERGAS"/CHINA OIL BEIJING OR ITS NOMINEE
CHARTER PARTY DATED 20TH JUNE 2007
=============================================================

(ii)   Any delay resulting from measures imposed by a port
facility or by any relevant authority under the ISPS
Code shall count as laytime or time on demurrage if the
vessel is on laytime or demurrage.   If the delay occurs
before laytime has started or after laytime or time on
demurrage has ceased to count, it shall be compensated
by the Charterers at the demurrage rate.

(D)   Notwithstanding anything to the contrary provided in this
Charter Party, any additional costs or expenses whatsoever
solely arising out of or related to security regulations or
measures required by the port facility or any relevant
authority in accordance with the ISPS Code including, but not
limited to, security guards, launch services, tug escorts,
port security fees or taxes and inspections, shall be for the
Charterer's account, unless such costs or expenses result
solely from the Owner's negligence.   All measures required by
the Owners to comply with the Ship Security Plan shall be for
the Owner's account.

(E)   If either party makes any payment which is for the other
party's account according to this Clause, the other party
shall indemnify the paying party.

7.   Charterers entitled to have one slop tank to load Charterers
cargo.

8.   Charterers agents both ends provided competitive.

9.   TORM Interim Port Clause:
     ----------------------------
     Charterers to pay for additional Interim Load/Discharge Port at
     cost with actual additional steaming time to be incurred for such
     deviation which exceeds direct passage from first load port to
     final discharge port as per BP's distance table at 15.0 knots.

     Time to count from arrival pilot station Interim Load/Discharge
     Port until Dropping Last Outward Pilot Interim Load/Discharge
     Port i.e. no allowance for notice time, nor deduction for
     shifting even from anchorage to first berth and no deduction for
     time lost due to tide, sea and weather conditions.   Deviation and
     time used to be calculated at demurrage rate per day pro-rata
     plus cost for additional bunkers consumed as per Master's
     telex/e-mail statement.

     Port costs to be settled directly by Charterers.   Deviation, time
     used, bunkers consumed to be paid together with freight as per
     Owners telex invoice, which later to be supported by hard copy
     documentation.

3

*RAFFLES SHIPBROKERS (S) PTE. LTD.*

M.T. "ALAM CERGAS"/CHINA OIL BEIJING OR ITS NOMINEE
CHARTER PARTY DATED 20TH JUNE 2007
===================================================

10.   The performance of this Charter Party will always be guaranteed
      by CHINAOIL.

11.   TORM Lightering Clause:
      ------------------------
      If lightering is required, same always to be in accordance with OCIMF
      Latest Edition of STS Transfer.  Charterers to supply all fenders/lines
      /hoses and any other equipment required for such operation at
      Charterer's time and expenses and always subject to Master's approval.
      Time to count in full six (6) hours after tendering Notice of Readiness
      or when first lighter vessel is alongside, whichever earlier, until
      last line/fender is off and lighter vessel has sailed.  Time lost due
      to tide and/or weather and/or sea conditions to count in full as
      laytime or demurrage if on demurrage.  If vessel is required to
      complete cargo operation at a berth in port, Charterers will not have
      the benefit of six (6) hours Notice of Readiness prior berthing in
      port.

12.   TORM Clauses (which are deemed to be incorporated in the Charter Party)
      --------------------------------------------------------------------
      12.1   CHARTERERS' STYLE CLAUSE:
             --------------------------

      1)   CHARTERERS' STYLE                    : CHINAOIL JAPAN CO., LTD.
      2)   DOMICILE                             : JAPAN
      3)   COMPANY REGISTERED IN                : HONG KONG
      4)   COMPANY REGISTRATION NUMBER          : 0104-01-032849
           FULL POSTAL ADDRESS                  : 8F, HIBIYA, MINATO-KU, TOKYO
                                                  105-0004, JAPAN
      6)   ADDRESS FOR SERVICE OF DOCUMENTS:      PETRO CHINA INT'L CO., LTD.
           INCLUDING DEMURRAGE CLAIMS IF        : NO. 27 CHENG FANG ROAD,
                                                  BEIJING 100032, CHINA
           DIFFERENT TO ITEM NO. 5 ABOVE        :
           PERSON/SECTION IN CHARGE             : MR XU ZHUOXUN
      7)   NAME OF MD OR CEO (SPECIFY)          : MR ZHAO YUNGANG
      8)   NAME(S) AND POSITION(S)              : MR ZHAO YUNGANG
           SIGNATORY/-IES TO LOI (IF/ANY)       :
      9)   NAME(S) AND POSITION(S) OF           
           PERSON IN CHARGE RESPONSIBLE FOR     
           CHARTERING                           : MS SHI WEI - CHARTERING MANAGER


      12.2   TAXES AND DUES CLAUSE:
             -----------------------
             Any taxes and/or dues on cargo and/or freight to be for
             Charterer's account and settled directly by them.

4

*RAFFLES SHIPBROKERS (S) PTE. LTD.*

M.T. "ALAM CERGAS"/CHINA OIL BEIJING OR ITS NOMINEE
CHARTER PARTY DATED 20TH JUNE 2007
=======================================================

12.3  CANCELLATION CLAUSE:
-----------------------
If it becomes obvious to the Owners that the vessel will not meet
her cancelling date, Owners to notify Charterers of vessels ETA
and proposed new cancelling date. Charterers have the option to
cancel the Charter within twenty-four (24) hours of notice or
extend in accordance with Owners new proposed cancelling date.
If Charterers decide to cancel the charter, it shall be without
any further liabilities to either party. If Charterers do not
cancel the Charter within twenty-four (24) hours after receipt of
Owners notice, the Charter Party is maintained on basis of the
new cancelling date proposed by the Owners.

12.4  DEMURRAGE TIME BAR CLAUSE:
-----------------------------
    12.4.1    The Charterers shall promptly notify the Owners of
              any objections to any demurrage claim under this
              Charter Party. Unless the Owners have received such
              notification within 45 days after the Charterer's
              receipt of the claim, the Charterers shall be deemed
              to have waived objection to the claim which shall be
              deemed accepted by the Charterers as presented.

    12.4.2    The Charterers shall pay any undisputed demurrage
              without delay.

12.5  TORM WAR RISK CLAUSE:
------------------------
Any and all war risk insurance premiums in force at the date of
this Charter Party shall be for Charterer's account except for
Owners Basic War Cover. Any increase in war risk insurance over
and above that in force at date of Charter Party including
insurance in respect of crew war bonus shall be for Charterer's
account.

Any rebate obtainable from Owners Underwriters to be passed onto
Charterers in full.

13.   Charterers Standard Clauses with amendments as per attached to apply.

5

*RAFFLES SHIPBROKERS (S) PTE. LTD.*

CHINA OIL STANDARD CHARTERING TERMS NO. 1 – 11

1.  Worldscale Terms and Conditions as of date of Charter Party to apply.

2.  Owners warrant that they will remain a member of ITOPF throughout the
    entire duration of this Charter Party.


3.  General Average/Arbitration in London, English Law to apply.

4.  YORK/Antwerp Rules as per ~~Latest Revision~~ to apply.    1994


5.  If the vessel has not given Notice of Readiness to load by 1500 Hours
    local time on the cancelling date, laytime shall commence upon the
    vessel's arrival in berth.

    or within 24 hours, whichever is earliest


6.  Vessel agents shall be nominated by Charterers at loading and discharge
    port(s).  Customary Agency Fees shall be for Owner's account.

                                              provided competitive

7.  Any taxes and/or dues on cargo and/or freight including Chinese Freight
    Tax not covered by Worldscale to be for Charterer's account and settled
    directly by them.

8.  Freight Payable in United States Dollars to Owners designated bank via
    telegraphic transfer three (3) working days after receipt of Owners'
    confirmation of completion of discharge.

9.  Should a dispute arise between Owners and the Charterers, both parties
    will endeavour to settle the matter in dispute amicably otherwise same
    to be settled in London by Arbitration as per Charter Party.

10. Owners warrant that vessel to proceed directly to discharge port after
    loading.


    unless in case of an emergency with prior or at least simultaneous
    information sent to Charterers in writing

11. This fixture has to be kept strictly Private and Confidential.

1

*RAFFLES SHIPBROKERS (S) PTE. LTD.*

## CHINA OIL CLAUSES NO. 1 - 19

1.  CLEAN BALLAST CLAUSE:
    The vessel should arrive at load port with clean and minimum ballast
    water.

2.  SHIFTING CLAUSE:
    If more than one (1) berth at load or discharge ports are used,
    shifting expenses to be for Charterer's account, except that shifting
    expenses from anchorage to first berth will not be for Charterer's
    account.

3.  BILLS OF LADING INDEMNIFICATION CLAUSE:
    In the event the original Bill of Lading does not arrive at the port(s)
    of ultimate discharge prior to the vessel's arrival, the Owners shall
    release and discharge the entire cargo in accordance with the
    Charterers' telex instructions and Charterers agree to indemnify and
    hold Owners harmless from and against any and all claims, demands or
    liabilities in connection with or arising out of the discharging of the
    cargo without presentation of such original Bill of Lading.

    Charterers also to provide Owners with a telex Letter of Indemnity with
    wording as per Owners' P and I Club. It is understood that no bankers
    Guarantee nor countersigning of Letter of Indemnity by bankers shall be
    required. If an Original Bill of Lading is distributed to Master for
    cargo receivers, Master shall discharge the entire cargo against cargo
    receivers' endorsement of this original Bill of Lading, and in such
    event no Letter of Indemnity shall be required.

    Letter of Indemnity shall automatically become null and void against
    presentation of one (1) out of three (3) original Bills of Lading. ~~or~~
    ~~after thirteen (13) months after completion of discharge, whichever~~
    ~~occurs first, provided within such thirteen (13) months no legal~~
    ~~proceedings have been instituted against Owners.~~



4.  AMOCO CLAIMS CLAUSE - 90 DAYS:  ⌐ REFER TO DEMURRAGE CLAIMS ONLY ⌐
    Owners agree to invoice Charterers for all charges and claims arising
    from this Charter Party, including but not limited to, demurrage,
    deadfreight, deviation and shifting, within ninety (90) days from the
    completion of discharge. Charterers will not be responsible for any
    charges or claims not submitted within the time specified.

*RAFFLES SHIPBROKERS (S) PTE. LTD.*

5.    WARRANTY CLAUSE:
    (a)    Owners warrant the vessel have no major breakdowns, pollution, strandings, or any serious accidents within the last twelve (12) months from the date of this Charter Party.

    (b)    Owners warrant that the vessel is classed as specified in Part I, and her every facility, including her technical and mechanical condition, is in good condition and working order for the carriage of the said cargo, with a full and efficient Complement of Master, Officers and Crew, and in all respects eligible for trading within, to and from port(s), ranges and areas specified in Charter Party, and that for all necessary times she shall have on board fully valid CLC/ITF and all necessary certificates and documents required for such service, in force as the date of this Charter.

    (c)    Owners warrant that the vessel to be fully cargo worthy of the said cargo, and load/carry/discharge the said cargo without contamination from residues of previous cargo.



direct

Any delay and consequential damages/losses suffered by the Charterers due to non-compliance by the Owners of the above warranties (a) to (c) to be for Owner's account.

6.    PUMPING CLAUSE:

an average

The vessel shall discharge the entire cargo within twenty-four (24) hours or maintain a back pressure of 100 PSI at ship's manifold provided shore facilities permit.

and sufficient hoses supplied



If the vessel fails to comply with the above warranty, the Charterers shall not be responsible for any demurrage caused by the failure.

7.    ~~AMCOO CARGO RETENTION CLAUSE:~~
    ~~Charterers shall have the right to deduct from freight the outturn loss basis CIF cargo value, inspected by independent or governmental cargo surveyors at discharging ports, if it exceeds 0.5% (Dirty) or 0.3% (Clean) of the gross quantity on the Bills of Lading.~~

    ~~Any action or lack of action in accordance with this provision shall be without prejudice to any rights or obligations of the parties.~~

8.    IGS CLAUSE:
    Owners warrant the vessel is equipped with a fully operational inert gas system.

3

*RAFFLES SHIPBROKERS (S) PTE. LTD.*

9. SPILLAGE CLAUSE:
Prior to commencement of loading or discharging operations, all overboard lines are to be checked to ensure there are securely closed. All other precautions are to be taken to avoid any spillage and/or leakage. If during loading or discharging operations there is any indication of a spillage or leakage, the vessel shall immediately cease all pumping operations and notify shore personnel. The vessel shall not resume loading or discharging until a thorough investigation is conducted and appropriate remedies taken.

Please refer to Special Provision Mll

10. AFRAN VESSEL TO VESSEL LIGHTERAGE CLAUSE:
~~If requested by Charterers, Owners agree that vessel will perform a Vessel To Vessel Lighterage operation at sea at a safe location other than the customary anchorage for the discharge port(s), in which event, Charterers will provide the lighterage vessel, mooring master, fenders, hoses and all other equipment necessary for a safe operation.~~



~~All time consumed from vessel to arrival at the lighterage site until the cargo hoses are disconnected shall count as used laytime as calculated in Part II hereof except those delays attributable to proven weather conditions which shall count as one half used laytime, or if on demurrage, one half demurrage, provided vessel is otherwise capable at all times of discharge while at the lighterage location.~~

~~The lighterage location shall not count as an additional discharge port or discharge berth in the determination of freight payable per published Worldscale Rates.~~

~~Owners warrant that the vessel is out fitted and capable of safely carrying out all procedures as set out in the Latest Revised Edition of the ICS/OCIMF Ship To Ship Transfer Guide (PETROLEUM).~~

Please refer to Special Provision Mll

11. AFRAN (GULF) LIGHTERAGE CLAUSE:
~~If lightering required prior to berthing at any designated port, and is is necessary to lighter the vessel while at a customary lightering anchorage, time used in lightering shall count as used laytime and shall commence six (6) hours after anchoring and presentation of Notice of Readiness or when the first lightering craft is moored alongside, whichever first occurs. The lightering anchorage shall not be considered as an additional discharge port nor an additional discharge berth and running time from the anchorage to the berth shall not count as used laytime or demurrage if allowed laytime has expired.~~



4

*RAFFLES SHIPBROKERS (S) PTE. LTD.*

12. ~~TEXACO CRUDE OIL WASHING CLAUSE:~~
~~Vessel will routinely employ Crude Oil Washing (COW) on discharge in~~
~~oil cargo tanks in accordance with the procedure described in the~~
~~IGS/OCIMF 'Guidelines for Tank Washing With Crude Oil' in the absence~~
~~of express contrary instructions of the Charterers or prohibition by~~
~~port or terminal regulations.  Any delays to the vessel occurring~~
~~solely as a result of COW operations upto six (6) hours shall count as~~
~~used laytime or if the vessel is on demurrage, as Demurrage.  COW~~
~~operation to be performed simultaneously with discharge.~~



~~Owners agree to comply with applicable port and terminal regulations,~~
~~and as necessary, to submit any advance information or technical data~~
~~that may be required by local authorities relative to the conduct of~~
~~COW operations.  Owners further agree that a representative of the~~
~~Charterer may attend the discharge to monitor cargo operations.~~

~~Master to follow Charterers' explicit orders given in voyage orders.~~

13. U.S.C.G. CLAUSE:
Owner warrants to have secured and carries onboard the vessel a U.S.
Federal Commission's Certificate of Financial Responsibility as
required under the U.S. Water Quality Improvement Act of 1980
(effective 0001/April 3, 1971), as amended.

Any delay or expense to the vessel resulting from non-compliance with
this warranty shall be for Owner's account and such delays will not
count as used laytime or demurrage if allowed laytime has expired.

14. U.S.C.G. COMPLIANCE CLAUSE:
Owners warrant that during the term of the Charter the vessel will be
in full compliance with all U.S. Coast Guard and Safety Regulations as
contained in, but not limited to, titles 33 and 46 of the Code of
Federal Regulations as amended.  Any delay or expense to the vessel
resulting from non-compliance with this warranty shall be for Owner's
account and such delays will not count as used laytime or demurrage if
allowed laytime has expired.

15. CANAL TOLL:
Suez or Panama Toll if applicable, shall be for Owner's account.

16. ADDRESS COMMISSION:
2.50 percent Address Commission to China Oil on Freight, Deadfreight
and Demurrage payable by Owners.  Such Address Commission is deductible
by Charterers from freight, ~~and if any, deadfreight~~ and demurrage.



*RAFFLES SHIPBROKERS (S) PTE. LTD.*

17.   SLOP CLAUSE:
      If any slops onboard at time of confirming fixture, Master shall report
      exact quality and content of oil, water and if any chemical used and
      location of Slop.  Charterers will revert if load on top or not.

      No load on top of slops is allowed unless instructed by Charterers.
      Owners warrant that vessel can comply with the Charter Party minimum
      cargo quantity.  No freight is payable on slops whether carried,
      discharged or not.

18.   ~~BUNKER CLAUSE:~~
      
      ~~Charterers shall have the option of supplying bunkers required for~~
      ~~performing this charter if available, provided that prices and quality~~
      ~~is competitive.  In the event that Owners are able to obtain bunkers at~~
      ~~a price lower than that quoted by Charterers, then Owners shall give~~
      ~~Charterers a further opportunity to meet such lower price.~~

19.   To be deleted.


                    CHINA OIL SPECIAL PROVISIONS NO. 1 - 22


1.    NOTICE OF READINESS CLAUSE:
      Vessel shall not tender Notice of Readiness and/or berth at load port
      prior to laydays commencing 00:01 Hours unless instructed to do so by
      Charterers.

2.    ~~EARLY LOADING CLAUSE:~~
      ~~If Charterers allow vessel to tender Notice of Readiness and berth~~
      ~~prior to laydays commencing, it is agreed that time saved from~~
      ~~commencement of loading until laytime otherwise would have commenced~~
      ~~(06:00 Hours) shall be deducted from laytime or demurrage, if vessel on~~
      ~~demurrage.~~

3.    CONOCO WEATHER CLAUSE:
      Delays in berthing for loading or discharging and any delays after
      berthing which are due to weather shall count as one half laytime or,
      if on demurrage, at one half demurrage rate.

4.    WAITING CARGO DOCUMENTS CLAUSE:
      Maximum three (3) hours waiting for cargo documents for Owner's
      account.

*RAFFLES SHIPBROKERS (S) PTE. LTD.*

5.  UNBERTHING CLAUSE:
    On completion of discharge and after hoses disconnected, vessel is to
    unberth within three (3) hours. If delays in unberthing is in excess
    of three (3) hours and such delays are due to vessel's requirements,
    such delays shall not count as laytime or demurrage if vessel is on
    demurrage and any additional charges incurred shall be for Owner's
    account.

6.  ~~TIDE AND DAYLIGHT CLAUSE:~~
     ~~Time used waiting for first suitable tide and/or daylight not to count
    as laytime or as demurrage if vessel is on demurrage.~~

7.  ~~SUNSET CLAUSE:~~
    ~~If vessel arrives at discharge port at 15:00 hours or later, time to
    commence 07:00 hours the next morning unless actually berthing sooner.~~

    |Please refer to Special Provision N12|

8.  ~~SEANPORTS LIGHTERING EXECUTION (LOADING) CLAUSE:~~
    ~~Option to load the vessel via Ship-To-Ship Transfer (Weather Permitting
    and subject to Master's approval which not to be unreasonably withheld)
    at anchorage or underway.~~

    ~~Charterers will provide all fenders, hoses and equipment necessary to
    perform the loading operation. Owners to agree to allow supervisory
    personnel onboard, including mooring master to assist in the
    performance of the loading operation.~~

    ~~Time shall commence upon the expiration of six (6) hours after receipt
    of Notice of Readiness on lighterage location until hoses disconnected
    excluding deballast time. Freight Payment to be based on entire
    cargo quantity loaded from actual load port(s) to the actual final
    discharge port(s).~~

9.  ETA CLAUSE:
    Vessel to advise Charterers daily ETA next port, present position,
    distance to go, weather, speed and cargo temperature if any.

    Should the expected arrival hour change by more than six (6) hours, the
    Owners shall promptly notify the parties as given in the Voyage Orders
    of the new arrival hour.

    In case of last port call on the proceeding voyage Owners/Master to
    advise of berthing prospects, discharging status and ETS.

    Should Owners fail to comply with the above and any delay at either
    load or discharge port result, such delays shall not be for Charterer's
    account.

*RAFFLES SHIPBROKERS (S) PTE. LTD.*

10. ~~SPEED ADJUSTMENT CLAUSE:~~
~~The vessel shall in Charterer's option perform her laden passage at a~~
~~speed between _____ and _____ knots weather and safe navigation~~
~~permitting. There shall be no additional costs for Charterer's~~
~~account to speed up or slow don within lowest and highest speed agreed~~
~~in this Clause. Charterers may amend speed when they deem necessary.~~



> Vessel to perform laden passage at about 14.0 knots weather safe
> navigation permitting.

11. INSPECTOR CLAUSE:
Charterers' privilege to put Charterers' Inspector ~~on vessel enroute or~~
at load and discharge port at their risk and expense. Inspector not to
interfere with or delay vessel's schedule or operation.

12. OCEANROUTING CLAUSE:
Charterers to have the option of applying "OCEANROUTING" and Owners/
Master should co-operate fully with instructions given. Costs for
ordering same to be for Charterer's account and paid directly by them.

> TORM WAR RISK CLAUSE - PLEASE REFER TO TORM CLAUSES NO. 17.5

13. ~~WAR RISK PREMIUM CLAUSE:~~
~~Any increase of Hull and Machinery War Risk Premium over and above~~
~~those in effect at the first date of laycan to be for Charterer's~~
~~account. Any premium of increase thereto attributable to closure (i.e.~~
~~blocking and trapping) shall be for Owner's account.~~

~~Surcharges which are in effect at the first date of layean are for~~
~~Owner's account for the first seven (7) days. Vessel's Hull and~~
~~Machinery to at maximum _____ Million.~~

14. BREAKDOWN AND SCRAPPING CLAUSE:
Owners guarantee that the vessel has had no major breakdowns in the
last twelve (12) months and also that the voyage to be performed under
this Charter Party is not the last prior to scrapping.


> To the best of [knowledge] will exercise due diligence in order to

15. RULES AND REGULATIONS:
Owners ~~guarantee that~~ the vessel will comply with Rules and Regulations
at load port and discharge Port, and Owners ~~shall~~/comply with all
requirements of the government and all authorities and agencies which
may have authority with respect to these rules and regulations.

16. BERTHING MANOEUVRING CLAUSE:
The vessel's arrival (ballast) condition enable her to be fully
operational in berthing maneuvering. The propeller will be fully
immersed prior to commencement of loading.

8

*RAFFLES SHIPBROKERS (S) PTE. LTD.*

17.  BASHAYER SBT CLAUSE:
     If loading at Bashayer Terminal or if otherwise required, upon arrival
     at load port all ballast will be located into the vessel's segregated
     ballast tanks (SBT Mode).

18.  ISRAEL CLAUSE:
     Owners confirm that the vessel has never traded to Israel under present
     Ownership.

19.  SHELL OIL POLLUTION INSURANCE CLAUSE:
     It is a condition of this Charter that Owners have in place cover for
     Oil Pollution of upto the maximum available through the International
     Group of P And I Clubs.  If requested by Charterers, Owners shall
     immediately furnish to Charterers full and proper evidence of the
     coverage.

20.  EXXON DRUG AND ALCOHOL POLICY CLAUSE:
     Owners warrant that it has a policy on Drug and Alcohol Abuse
     ("Policy") applicable to the vessel which meets or exceeds The
     Standards In The Oil Companies International Marine Forum Guidelines
     For The Control of Drugs and Alcohol Onboard Ship.  Under the policy,
     alcohol impairment shall be defined as a blood alcohol content 40mg/
     100ml or greater; the appropriate seafarers to be tested shall be all
     vessel's officers' and the Drug/Alcohol Testing and Screening shall
     include unannounced testing in addition to routine medical
     examinations.  An objective of the policy should be that the frequency
     of the unannounced testing be adequate to act as an effective abuse
     deterrent, and that all officers be tested at least once a year through
     a combined program of unannounced testing and routine medical
     examinations.

21.  INTERIM VOYAGE CLAUSE:
     Owners warrant that the vessel will not perform any Interim Voyage.



without Charterers prior agreement

PLEASE REFER TO TOBM CLAUSES NO. 12,3

22.  CANCELLING CLAUSE:
     ~~If at the cancelling time vessel is not ready to load, Owners to give~~
     ~~Charterers a new layday(s) (same spread as the original laydays) for~~
     ~~which Charterers to have 48 hours to advise if they will cancel this~~
     ~~Charter Party.~~



\*\*\*\*\*\*\*\*\*\*\*

9

printed by winston



"Davin"
<davin@raffles-shipbrokers:
com.sg>
21/06/2007 15:03

To  <pang.yanqing@chinaoil.com.cn>, "Pacific Carriers Ltd "
    <tanker@pacificcarriers.com.sg>
cc  "CHINAOIL -WANG PENG " <wang.peng@chinaoil.com.cn>
bcc

Subject  ALAM CEGRAS / CHINAOIL CP 20.06.2007 -RECAP


TO   : CHINAOIL
ATTN : MR PANG YAN QING
CC   : MR WANG PENG
TO   : PCL SHIPPING PTE LTD
ATTN : MR TROND
FM   : RAFFLES SHIPBROKERS
DATE : 20.06.2007

RE   : ALAM CEGRAS / CHINAOIL CP 20.06.2007 -RECAP
===========================================================================
WITH REF TO EARLIER TELECON, WE ARE PLEASED TO CONFIRM CHARTERERS LIFTED
ALL THEIR SUBJECTS AND WE NOW HAVE A CLEAN FIXTURE DATED 20TH JUNE 2007.


+ + + STRICTLY PRIVATE AND CONFIDENTIAL PLS + + +

- CHARTERERS              : CHINA OIL OR IT'S NOMINEE
- COMMERCIAL OPERATOR     : PCL (SHIPPING) PTE LTD

SHIP                      : M/T ALAM CEGRAS
SDWT                      : 34,571 MT
DRAUGHT                   : 11.888 M
LOA                       : 171.20 M
BEAM                      : 27.40 M
BUILT                     : 2007
FLAG                      : SINGAPORE
CAPACITY AT 98 PCT        : 36,736.4 M3 EXCLUDING SLOP TANKS
SLOP CAPACITY AT 98 PCT   : 1,315.9 M3
SBT/CBT                   : SBT
COW                       : N/A
IGS                       : YES
TPC                       : 41.5 T
BCM                       : 83.3 M
KTM                       : 44.70 M
TYPE OF COATINGS          : EPOXY
TYPE OF COILS             : STAINLESS STEEL
CLASS                     : LLOYDS
DERRICKS/CRANES           : 1 X 10MT (CRANE)
SCNT                      : 23,621.64 MT
PCRT                      : 18,492 MT
GRT                       : 22,184 MT

LAST CARGO                : N/A, NEW BUILDING
2ND LAST CARGO            : N/A, NEW BUILDING
3RD LAST CARGO            : N/A, NEW BUILDING

ITINERARY                 : VESSEL EX YARD DALIAN 20/JUNE IF AGW WP


CARGO DESCP      : CHARTERERS OPTION UP TO FULL CARGO. UNLEADED CLEAN
PETROLEUM
                 PRODUCT UNDARKER THAN 2.5 NFA MAX 2 GRADES WITHIN
VESSEL'S NATURAL
                 SEGREGATION. EXCLUDING LUBES, MTBE,
CHEMICALS, PETROCHEMICALS,
                 CASINGHEAD AND PENTANES, AND EXCLUDE PARAFFINIC

printed by winston

NAPHTHA

LOAD RANGE        : 1 SP DALIAN

DISCHARGE RANGE : 1 SP SINGAPORE OR INCHOPT
                  1 SP SOUTH KOREA, INCHON - ULSAN RANGE
                  1 SP JAPAN NOT NORTH OF BUT INCLUDING TOKYO BAY OR
INCHOPT
                  1 SP PHILIPPINES, BATAAN - BATANGAS RANGE INCLUDING
SUBIC BAY

*IF VESSEL TO DISCHARGE SOUTH KOREA OR JAPAN,, CHARTERERS TO DECLARE
LATEST BY 1200 HOURS SINGTIME
ON 22ND JUNE 2007, FRIDAY.

FREIGHT          : LUMPSUM USD 350,000 BSS 1:1 SINGAPORE
                   LUMPSUM USD 300,000 BSS 1:1 SOUTH KOREA
                   LUMPSUM USD 330,000 BSS 1:1 JAPAN
                   LUMPSUM USD 340,000 BSS 1:1 PHILIPPINES

DEMURRAGE        : USD 21,000 PDPR

LAYTIME          : TTL 84 HRS SHINC

C/P              : ASBATANKVOY

SPECIAL PROVISIONS
-------------------

01. WSTC

02. ANY TAXES AND/OR DUES ON FRT AND/OR CARGO TO BE FOR CHTRS ACCT
    AND SETTLED DIRECTLY BY THEM

03. BIMCO ISPS CLAUSE
    (A) (I) FROM THE DATE OF COMING INTO FORCE OF THE INTERNATIONAL CODE
            FOR THE SECURITY OF SHIPS AND OF PORT FACILITIES AND THE
RELEVANT
            AMENDMENTS TO CHAPTER XI OF SOLAS (ISPS CODE) IN RELATION TO
            THE VESSEL, THE OWNERS SHALL PROCURE THAT BOTH THE VESSEL
AND
            "THE COMPANY" (AS DEFINED BY THE ISPS CODE) SHALL COMPLY
WITH THE
            REQUIREMENTS OF THE ISPS CODE RELATING TO THE VESSEL AND
"THE
            COMPANY". UPON REQUEST THE OWNERS SHALL PROVIDE A COPY OF
THE
            RELEVANT INTERNATIONAL SHIP SECURITY CERTIFICATE (OR THE
INTERIM
            INTERNATIONAL SHIP SECURITY CERTIFICATE) TO THE
CHARTERERS. THE
            OWNERS SHALL PROVIDE THE CHARTERERS WITH THE FULL STYLE
CONTACT
            DETAILS OF THE COMPANY SECURITY OFFICER (CSO).
        (II) EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER PARTY,
             LOSS, DAMAGE, EXPENSE OR DELAY, EXCLUDING CONSEQUENTIAL LOSS,
             CAUSED BY FAILURE ON THE PART OF THE OWNERS OR "THE COMPANY"
TO
            COMPLY WITH THE REQUIREMENTS OF THE ISPS CODE OR THIS CLAUSE
SHALL
            BE FOR THE OWNERS' ACCOUNT.
    (B) (I) THE CHARTERERS SHALL PROVIDE THE CSO AND THE SHIP SECURITY

printed by winston

```
                     OFFICER (SSO)/MASTER WITH THEIR FULL STYLE CONTACT DETAILS
AND
                     ANY OTHER INFORMATION THE OWNERS REQUIRE TO COMPLY WITH THE
ISPS
                     CODE.
              (II) EXCEPT AS OTHERWISE PROVIDED IN THIS CHARTER
PARTY, LOSS, DAMAGE,
                     EXPENSE, EXCLUDING CONSEQUENTIAL LOSS, CAUSED BY FAILURE ON
THE
                     PART OF THE CHARTERERS TO COMPLY WITH THIS CLAUSE SHALL BE
FOR
                     THE CHARTERERS' ACCOUNT AND ANY DELAY CAUSED BY SUCH FAILURE
                     SHALL BE COMPENSATED AT THE DEMURRAGE RATE.

       (C)           PROVIDED THAT THE DELAY IS NOT CAUSED BY THE OWNERS' FAILURE
TO
                     COMPLY WITH THEIR OBLIGATIONS UNDER THE ISPS CODE, THE
FOLLOWING
                     SHALL APPLY:
              (I) NOTWITHSTANDING ANYTHING TO THE CONTRARY PROVIDED IN THIS
                     CHARTER PARTY, THE VESSEL SHALL BE ENTITLED TO TENDER NOTICE
OF
                     READINESS EVEN IF NOT CLEARED DUE TO APPLICABLE SECURITY
                     REGULATIONS OR MEASURES IMPOSED BY A PORT FACILITY OR ANY
                     RELEVANT AUTHORITY UNDER THE ISPS CODE.
              (II) ANY DELAY RESULTING FROM MEASURES IMPOSED BY A PORT FACILITY
OR
                     BY ANY RELEVANT AUTHORITY UNDER THE ISPS CODE SHALL COUNT AS
                     LAYTIME OR TIME ON DEMURRAGE IF THE VESSEL IS ON LAYTIME OR
                     DEMURRAGE. IF THE DELAY OCCURS BEFORE LAYTIME HAS STARTED OR
                     AFTER LAYTIME OR TIME ON DEMURRAGE HAS CEASED TO COUNT, IT
SHALL
                     BE COMPENSATED BY THE CHARTERERS AT THE DEMURRAGE RATE.

       (D)           NOTWITHSTANDING ANYTHING TO THE CONTRARY PROVIDED IN THIS
CHARTER
                     PARTY, ANY ADDITIONAL COSTS OR EXPENSES WHATSOEVER SOLELY
ARISING
                     OUT OF OR RELATED TO SECURITY REGULATIONS OR MEASURES
REQUIRED BY
                     THE PORT FACILITY OR ANY RELEVANT AUTHORITY IN ACCORDANCE
WITH THE
                     ISPS CODE INCLUDING, BUT NOT LIMITED TO, SECURITY GUARDS,
LAUNCH
                     SERVICES, TUG ESCORTS, PORT SECURITY FEES OR TAXES AND
INSPECTIONS,
                     SHALL BE FOR THE CHARTERERS' ACCOUNT, UNLESS SUCH COSTS OR
EXPENSES
                     RESULT SOLELY FROM THE OWNERS' NEGLIGENCE. ALL MEASURES
REQUIRED BY
                     THE OWNERS TO COMPLY WITH THE SHIP SECURITY PLAN SHALL BE
FOR THE
                     OWNERS' ACCOUNT.

       (E)           IF EITHER PARTY MAKES ANY PAYMENT WHICH IS FOR THE OTHER
PARTY'S
                     ACCOUNT ACCORDING TO THIS CLAUSE, THE OTHER PARTY SHALL
INDEMNIFY
                     THE PAYING PARTY

04. CHARTERERS ENTITLED TO HAVE ONE SLOPS TANKS TO LOADED CHARTERERS
CARGO

05. CHARTERERS AGENTS BOTH ENDS PROVIDED COMPETITIVE

06. FREIGHT PAYMENT DETAILS
```

printed by winston

FREIGHT PAYABLE IN UNITED STATES DOLLARS TO THE OWNERS NOMINATED ACCOUNT
BY TELEGRAPHIC TRANSFER TO:
THE BANK OF NEW YORK, NEW YORK
FOR ACCOUNT OF OCBC BANK, SINGAPORE
SWIFT: OCBCSGSG
FAVOURING: NEW JOHNSON HOLDINGS LIMITED USD A/C NO. 501-885172-201
UNDER TESTED TELEX ADVICE TO OCBC BANK, SINGAPOREUPON REMITTANCE

07. TORM INTERIM PORT CLAUSE:
--------------------------------------

CHARTERERS TO PAY FOR ADDITIONAL INTERIM LOAD/DISCH PORT AT COST WITH
ACTUAL ADDITIONAL STEAMING TIME TO BE INCURRED FOR SUCH DEVATION WHICH
EXCEEDS DIRECT PASSAGE FROM FIRST LOADPORT TO FINAL DISCHPORT AS PER
BP'S DISTANCE TABLE AT 15.0 KNOTS.

TIME TO COUNT FROM ARRIVAL PILOT STATION INTERIM LOAD/DISCHARGE PORT
UNTIL DROPPING LAST OUTWARD PILOT INTERIM LOAD/DISCHARGE PORT I.E. NO
ALLOWANCE FOR NOTICE TIME, NOR DEDUCTION FOR SHIFTING EVEN FROM
ANCHORAGE TO FIRST BERTH AND NO DEDUCTION FOR TIME LOST DUE TO TIDE, SEA
AND WEATHER CONDITIONS. DEVIATION AND TIME USED TO BE CALCULATED AT
DEMURRAGE RATE PER DAY PRO RATA PLUS COST FOR ADDITIONAL BUNKERS
CONSUMED AS PER MASTER'S TELEX/EMAIL STATEMENT.

PORT COSTS TO BE SETTLED DIRECTLY BY CHARTERERS. DEVIATION, TIME USED,
BUNKERS CONSUMED TO BE PAID TOGETHER WITH FREIGHT AS PER OWNERS TELEX
INVOICE, WHICH LATER TO BE SUPPORTED BY HARD COPY DOCUMENTATION.

08. THE PERFORMANCE OF THIS CHARTER PARTY WILL ALWAYS BE GUARANTEED BY
CHINAOIL.

CHINAOIL STANDARD CHARTERING TERMS NO 1-11
CLS 04 "LATEST REVISION" INSERT "1994"
CLS 08 ADD AT END "OR WITHIN 24 HOURS, WHICHEVER IS EARLIEST."
CLS 09 2ND LINE AFTER "ACCOUNT" INSERT "PROVIDED COMPETITIVE"
CLS 10 ADD AT END " UNLESS IN CASE OF AN EMERGENCY WITH PRIOR OR AT
LEAST SIMUTANEOUS INFORMATION SENT TO CHTRS IN WRITING"

CHINAOIL CLAUSES NO 1-19
CLS 02 1ST LINE DELETE "THEN" INSERT "THAN"
CLS 03 1ST LINE DELETE "OF ULTIMATE"
PARA 3 DELETE "OR AFTER 13 (THIRTEEN) MONTHS AFTER COMPLETION OF
DISCHARGE WHICHEVER OCCURS FIRST, PROVIDED WITHIN SUCH
13(THIRTEEN) MONTHS NO LEGAL PROCEEDINGS HAVE BEEN INSTITUTED AGAINST
OWNERS.
CLS 04 TO REFER TO DEMURRAGE CLAIMS ONLY CLS 05 1ST LINE AFTER "HAVE"
INSERT "HAD"
CLS 05C PARA 2 LINE 1 AFTER "AND" INSERT "DIRECT"
CLS 06 2ND LINE AFTER "OF" INSERT "AN AVERAGE"
AFTER "PERMIT" AND INSERT " AND "SUFFICIENT HOSES SUPPLIED"
CLS 07 DELETE
CLS 10 DELETE SEE TORM CLS 9, ADD "WHERE APPLICABLE"
CLS 11 DELETE SEE TORM CLS 9, ADD "WHERE APPLICABLE"
CLS 12 DELETE, N/A
CLS 18 DELETE
CLS 19 DELETE N/A

CHINAOIL SPECIAL PROVISIONS NO 1-22
CLS 02 DELETE

printed by winston

CLS 06 DELETE
CLS 07 DELETE N/A FOR THIS VOYAGE
CLS 08 DELETE, AND INSERT TORM LIGHTERIN CLS
CLS 10 DELETE AND INSERT "VESSEL TO PERFORM LADEN PASSAGE AT ABT 14.0
KNOTS WSNP"
CLS 11 1ST LINE DELETE "ON VESSEL ENROUTE OR"
CLS 13 DELETE AND INSERT TORM WAR RISK CLS
CLS 15 ADD AT BEGINNING "TO THE BEST OF"
1ST LINE DELETE "GUARANTEE THAT" AND INSERT "KNOWLEDGE"
2ND LINE DELETE "SHALL" INSERT "WILL EXERCISE DUE DILLIGENCE IN ORDER
TO"
CLS 21 ADD AT END "WITHOUT CHARTERERS PRIOR AGREEMENT"
CLS 22 DELETE AND INSERT TORM CANCELLING CLS

TORM CLAUSES
=============
1. CHARTERERS' STYLE CLAUSE: (PLS ADVISE)
-----------------------------
1) CHARTERERS' STYLE   :
2) DOMICILE            :
3) COMPANY REGISTERED IN  :
4) COMPANY REGISTRATION NUMBER  :
5) FULL POSTAL ADDRESS :
6) ADDRESS FOR SERVICE OF DOCUMENTS INCL. DEMURRAGE CLAIMS IF DIFFERENT
TO ITEM NO. 5 ABOVE  :
PERSON/SECTION IN CHARGE          :
7) NAME OF MD OR CEO (SPECIFY)    :
8) NAME(S) AND POSITION(S) SIGNATORY/-IES TO LOI (IF/ANY):
9) NAME(S) AND POSITION(S) OF PERSON IN CHARGE/RESPONSIBLE FOR
CHARTERING:

2.TAXES AND DUES CLAUSE
-----------------------
ANY TAXES AND/OR DUES ON CARGO AND/OR FREIGHT TO BE FOR CHARTERERS
ACCOUNT AND SETTLED DIRECTLY BY THEM.

3.CANCELLATION CLAUSE
---------------------
IF IT BECOMES OBIOUS TO THE OWNERS THAT THE VESSEL WILL NOT MEET HER
CANCELLING DATE, OWNERS TO NOTIFY CHARTERERS OF VESSELS ETA AND PROPOSED
NEW CANCELLING DATE. CHARTERERS HAVE THE OPTION TO CANCEL THE CHARTER
WITHIN 2 WORKING DAYS OF NOTICE OR EXTEND IN ACCORDANCE WITH OWNERS NEW
PROPOSED CANCELLING DATE. IF CHARTERERS DECIDE TO CANCEL THE CHARTER, IT
SHALL BE WITHOUT ANY FURTHER LIABILITIES TO EITHER PARTY.
IF CHARTERERS DO NOT CANCEL THE CHARTER WITHIN 2 WORKING DAYS AFTER
RECEIPT OF OWNERS NOTICE, THE CHARTER PARTY IS MAINTAINED ON BASIS OF
THE NEW CANCELLING DATE PROPOSED BY OWNERS.

4.DEMURRAGE TIME BAR CLAUSE
---------------------------
1) THE CHARTERERS SHALL PROMPTLY NOTIFY THE OWNERS OF ANY OBJECTIONS TO
ANY DEMURRAGE CLAIM UNDER THIS CHARTER PARTY.UNLESS THE OWNERS HAVE
RECIEVED SUCH NOTIFICATION WITHIN 45 DAYS AFTER THE CHARTERER'
RECEIPT OF THE CLAIM, THE CHARTERERS SHALL BE DEEMED TO HAVE WAIVED
OBJECTION TO THE CLAIM WHICH SHALL BE DEEMED ACCEPTED BY THE CHARTERERS
AS PRESENTED.

2) THE CHARTERERS SHALL PAY ANY UNDISPUTED DEMURRAGE WITHOUT DELAY.

5. WAR RISK CLS
---------------
ANY AND ALL RISK INSURANCE PREMIUMS IN FORCE AT THE DATE OF THIS CHARTER
PARTY SHALL BE FOR CHARTERERS ACCOUNT EXCEPT FOR OWNERS BASIC WAR COVER.
ANY INCREASE IN WAR RISK INSURANCE OVER AND ABOVE THAT IN FORCE AT DATE
OF CHARTER PARTY INCLUDING INSURANCE IN RESPECT OF CREW WAR BONUS SHALL
BE FOR CHARTERER'S ACCOUNT.

printed by winston

ANY REBATE OBTAINABLE FROM OWNERS UNDERWRITERS TO BE PASSED ON TO
CHARTERERS IN FULL.

============================================================================
                              (COMMISSION)

2.50PCT ADD COMM TO CHARTERER ON FRT/DEM TO BE DEDUCTED AT SOURCE
1.25PCT BROKERAGE COMM ON FRT/DEM TO RAFFLES SHIPBROKERS(S) PTE LTD

============================================================================

 <<Alam Cergas Q88.doc>>  <<IOPP - Record of Construction and Equipment
for Oil Tankers.pdf>>  <<IOPP Certificate.pdf>>  <<Mooring
Arrangement.Alam Cergas.xls>>  <<FOC_AppendixI -Alam Cergas.doc>>

++END RECAP++

THANK YOU VERY MUCH FOR YOUR SUPPORT FOR THE ABOVE FIXTURE

RGDS
DAVIN/RAFFLES

Alam Cergas Q88.doc  IOPP - Record of Construction and Equipment for Oil Tankers.pdf  IOPP Certificate.pdf

Mooring Arrangement.Alam Cergas.xls  FOC_Appendix -Alam Cergas.doc

# EXHIBIT 2



**PACIFIC CARRIERS LIMITED**
Company Registration No: 197300034E
(A Member of Kuok Group)

No. 1 Kim Seng Promenade #07-02
Great World City Singapore 237994
Tel: 6733 3500  Fax: 6737 3966
Telex: RS 23245
Website: http://www.pclsg.com

06/09/2007

Demurrage Invoice
=======================

TO:    CHINAOIL (JAPAN) CO LTD

M/T "ALAM CERGAS"/CHINAOIL (JAPAN) CO LTD

CHARTER PARTY DATED 20/06/2007

LOAD PORT:       DALIAN, CHINA

DISCHARGE PORT:    CHIBA, JAPAN

**NET AMOUNT DUE TO OWNERS    USD 166,146.09**

(UNITED STATES DOLLARS ONE HUNDRED AND SIXTY SIX THOUSAND AND ONE HUNDRED AND
FORTY SIX AND CENTS NINE ONLY)

PAYMENT TO BE EFFECTED BY 14TH SEPTEMBER 2007 VIA TELEGRAPHIC TRANSFER TO:

THE BANK OF NEW YORK, NEW YORK
FOR ACCOUNT OF OCBC BANK, SINGAPORE
SWIFT: OCBCSGSG
FAVOURING: NEW JOHNSON HOLDINGS LIMITED
USD A/C NO.501-885172-201
UNDER TESTED TELEX ADVICE TO OCBC BANK, SINGAPORE UPON REMITTANCE
REFERENCE: M/T "ALAM CERGAS"/CHINAOIL(JAPAN) CO LTD/CP 20/06/2007

YOURS TRULY,

WINSTON LIM
*PCL (SHIPPING) PTE LTD*
COMMERCIAL OPERATOR

# EXHIBIT 3

printed by winston

 "Fixtures"
<fixtures@raffles-shipbroke
rs.com.sg>
18/10/2007 11:37

To   <tanker@pacificcarriers.com.sg>

cc   "Cheryl" <Cheryl@raffles-shipbrokers.com.sg>, "Jin"
<jin@raffles-shipbrokers.com.sg>, "Davin"
<davin@raffles-shipbrokers.com.sg>

bcc

Subject   FW: RE: Alam Cerpas/Chinaoil CP 20/09/07 Dem

Urgent
=======

Dear capt lim,

Ref dem usd 166,146.09 (net) — plsd to hv recvd flwg fm chrs :

Qte :

Attn: Mr. Stanley
From: Chinaoil (Japan)

Dear Mr. Stanley,

The payment of the demurrage has been arranged with the value date of
Oct. 22, 2007.
Please ask the Owner to kindly advise the safe receipt.

Best regards.
Pang Yanqing
For and on behalf of
Chinaoil (Japan) Co., Ltd.

== == == == == == == == == == == == == == == == == == == == == == ==

Unqte :


Appreciate owrs cnfmtn upon safe rcept pls.

Tks n rgds

Stanley chan



"Fixtures"
<fixtures@raffles-ship
brokers.com.sg>
14-11-97 19:17

To  "Winston Lim" <tanker@pacificcarriers.com.sg>
cc  "Irene Lim" <services@pacificcarriers.com.sg>
bcc
Subject  FW: RE: ADAM CERGAS/ CHINAOIL C/P dated
         20.09.2307 - Unpaid demurrage - USD166,146.99
         - URGENT!!!

Dear capt lim.

Ref dem – hv recvd flwg fm chrs :

Qte :

Dear Mr. Stanley,

The Charterer is arranging the payment. Shall try to advise the value date
soonest.

Best regards.
Fang Yanqing
For and on behalf of
Chinaoil (Japan) Co., Ltd.

Unqte :

Hope to revrt with value date.

Rgds
Stanley chan